EL PUEBLO DE PUERTO RICO, apelado, *v.* JUAN RIVERA TORRES, acusado y apelante.

*Número:* CR-86-14    *Resuelto:* 22 de abril de 1988

---

*Cándida Valdespino Zapata,* de la Sociedad para Asistencia Legal, abogada del apelante; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General,* y *Marjorie Rivera Rodríguez, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

Juan Rivera Torres fue acusado por haber cometido los delitos de asesinato en primer grado, Art. 83 del Código Pe-

nal, 33 L.P.R.A. sec. 4002;(1) robo, Art. 173 del Código Penal, 33 L.P.R.A. sec. 4279, e infracción a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418. El acusado presentó una moción bajo la Regla 64(p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, en la que sostenía que la acusación no imputaba el delito de asesinato estatutario. El 30 de junio de 1986 el tribunal declaró sin lugar dicho planteamiento, el cual fue reproducido y denegado en el juicio al terminar la prueba de cargo. Una vez sometidos los casos a la consideración del jurado, éste rindió veredictos de culpabilidad en todos los casos. En el acto de pronunciamiento de sentencia, el tribunal consideró y resolvió las mociones sobre agravantes y atenuantes presentadas por el Ministerio Público y la defensa e impuso las sentencias siguientes:

(1) asesinato en primer grado, noventinueve (99) años,

(2) robo, veinte (20) años,

(3) Art. 6, diez (10) años,

(4) Art. 8, diez (10) años.

Estas penas serán cumplidas en forma consecutiva entre sí y con el asesinato.

El acusado apeló dentro del término legal. El tribunal aprobó la exposición narrativa de la prueba preparada por la defensa y aceptada como correcta por el fiscal que intervino en el juicio.

En apoyo del presente recurso el acusado apelante sostiene que se cometieron los errores siguientes:

---

(1) El pliego acusatorio dice así:

"Allá para el día 31 de julio de 1985 y en Río Piedras, Puerto Rico, que forma parte del Tribunal Superior de Puerto Rico, Sala de San Juan, Puerto Rico, allí y entonces, el referido acusado Juan Rivera Torres, ilegal, voluntaria y criminalmente, con alevosía, malicia premeditada y deliberación, y con el propósito decidido y firme de matar, dió muerte al ser humano Eduardo Mateo Ortiz, consistente en que al perpetrar el delito de robo, y originándose un tiroteo, el aquí acusado hizo varios disparos a la Policía originándose un tiroteo, siendo alcanzado el referido Eduardo Mateo Ortiz con un proyectil en la frente que le ocasionó herida, a consecuencia directa de cuya [sic] herida murió."

A. Erró el Honorable Tribunal Sentenciador al resolver que dentro de las circunstancias del presente caso aplicaba la doctrina del asesinato estatutario. (Felony Murder Rule).

B. Erró el Honorable Tribunal Sentenciador al imponer según las circunstancias de este caso agravantes en la sentencia sin que se hubiere demostrado por el Ministerio Público motivos para la misma. Alegato del apelante, pág. 8.

I

La prueba en este caso es sencilla y no hay controversia sobre los hechos que tuvo ante sí el jurado.

Elba M. López Sanfeliz es farmacéutica y condueña de la Farmacia Yarimar. Atestó que el 31 de julio de 1985, a eso de las 4:15 de la tarde, entraron dos (2) individuos a la farmacia. Al verlos ella y un empleado de nombre Osvaldo, sospecharon de ellos y se mantuvieron pendientes. Los individuos, quienes fueron posteriormente identificados como Juan Rivera Torres y Eduardo Mateo Ortiz, fueron a la parte de efectos escolares, tomaron una libreta y preguntaron cuál era el precio. La señora López, para disimular, tomó el teléfono en el recetario y, en ese momento, Eduardo le gritó: "[s]uelta el teléfono que esto es un asalto" y le apuntó con un arma. En esos momentos observó que su empleado Osvaldo le estaba dando dinero de la caja al apelante, Juan Rivera Torres, quien no estaba armado. Eduardo le exigió que le entregara una cadena. Sentaron a Osvaldo en el piso y, mientras Eduardo le apuntaba con el arma, el apelante le decía a Eduardo: "Dispárale para que ella hable." Luego de tomar unas pastillas de *Valium*, los levantaron y los encerraron en el baño. Al retirarse los asaltantes, Osvaldo y ella salieron del baño, oyeron un tiroteo y se fueron para afuera. El agente Amos Arocho le entregó a la testigo un bolso de papel que contenía mercancía de la farmacia.

Coetáneamente con dichos incidentes los agentes Amos Arocho Torres y José A. Mojica Rivera, mientras llevaban a

cabo una patrulla preventiva, se habían detenido frente al local para ir al salón de belleza contiguo. Una empleada les advirtió que la farmacia estaba cerrada y no había podido ver a nadie dentro. Los agentes fueron a investigar. Al llegar, vieron salir a Mateo Ortiz y al acusado apelante. Mateo les dijo que la farmacia estaba cerrada. Rivera Torres llevaba una bolsa. Los agentes se identificaron y les informaron que estaban detenidos. Mateo Ortiz sacó un arma de la cintura y corrió hacia la derecha. Rivera Torres corrió hacia la izquierda. Mientras Arocho perseguía a Rivera Torres, hizo dos (2) disparos al aire para que se detuviera, pero él soltó la bolsa y logró escapar. Mientras eso ocurría, Mojica Rivera se había ido detrás de Mateo. Éste no hizo caso a los disparos al aire. Desde un solar cercano, Mateo Ortiz se viró y le apuntó con el arma. Mojica hizo fuego y lo hirió mortalmente en la frente.

## II

La primera cuestión a resolver es si la prueba presentada, según creída por el juzgador de los hechos, configura el delito de asesinato estatutario.

■ La doctrina de asesinato estatutario está recogida en el Art. 83 del Código Penal, el cual dispone, en su parte pertinente, que toda muerte causada al "perpetrarse o intentarse algún incendio agravado, violación, sodomía, robo, escalamiento, secuestro, estragos, mutilación o fuga" constituye asesinato en primer grado. 33 L.P.R.A. sec. 4002.

■ En *Pueblo v. Lucret Quiñones*, 111 D.P.R. 716 (1981), analizamos la trayectoria histórica de esta doctrina anglosajona y reconocimos su validez y aplicabilidad en nuestra jurisdicción. Posteriormente, en *Pueblo v. Calderón Laureano*, 113 D.P.R. 574 (1982), señalamos la existencia de dos (2) teorías distintas aplicables a casos en que se imputa

un asesinato estatutario: a saber, la teoría de la agencia y la teoría de la causa próxima. Bajo la teoría de la agencia, para que una muerte causada al perpetrarse o intentar perpetrarse un delito grave sea considerada como asesinato estatutario, la misma tiene que haber sido causada directamente por el acusado, su cómplice o agente. Esta es la teoría aplicada en la mayoría de las jurisdicciones. Véanse: en Pennsylvania, *Commonwealth v. Redline*, 137 A.2d 472 (1958); *Commonwealth ex rel. Smith v. Myers*, 261 A.2d 550 (1970); en California, *People v. Washington*, 402 P.2d 130 (1965); *People v. Gilbert*, 408 P.2d 365 (1965); *People v. Antick*, 539 P.2d 43 (1975); en Massachusetts, *Commonwealth v. Balliro*, 209 N.E.2d 308 (1965); en Nueva Jersey, *State v. Canola*, 374 A.2d 20 (1977); en Nuevo Mexico, *Jackson v. State*, 589 P.2d 1052 (1979); en Delaware, *Weick v. State*, 420 A.2d 159 (1980).

La teoría de la causa próxima, por su parte, propugna que toda muerte causada al perpetrarse un delito grave es punible como asesinato en primer grado bajo las disposiciones del asesinato estatutario si la comisión del delito es la causa próxima de dicha muerte, independientemente de que la misma no hubiese sido causada directamente por el acusado. Bajo esta teoría se entiende que al cometer el delito grave el autor del delito ha puesto en marcha una sucesión de eventos que previsiblemente puede desembocar en la muerte de un ser humano y, por tal razón, el autor del delito es responsable de todas las consecuencias naturales y probables de ese acto que inició. *Pueblo v. Calderón Laureano*, supra, pág. 578. Un reducido número de jurisdicciones ha adoptado esta teoría. Véanse: en Florida, *State v. Wright*, 379 So. 2d 96 (1979); en Oklahoma, *Johnson v. State*, 386 P.2d 336 (1963); en Illinois, *People v. Hickman*, 319 N.E.2d 511 (1974); en Missouri, *State v. Moore*, 580 S.W.2d 747 (1979); *State v. Baker*, 607 S.W.2d 153 (1980).

En *Pueblo v. Calderón Laureano*, supra, limitando expresamente el análisis a sus hechos particulares, muerte de un tercero inocente a manos de la Policía, optamos por adoptar la teoría de la causa próxima, ya que entendíamos que para los hechos particulares del caso era el enfoque más razonable. Allí, los asaltantes se enfrascaron en varios intercambios de disparos con la Policía dentro y fuera del supermercado asaltado, estando presentes empleados y clientes del mismo. Todos los asaltantes estaban armados.

■ La comisión del delito grave desencadenó una serie de eventos (varios tiroteos con la Policía) que causaron la muerte de un ser humano. Esta serie de eventos denotaban un gran menosprecio por la vida humana y era altamente previsible que alguien resultara herido como consecuencia de los mismos. Procedía, bajo esas circunstancias, imponerle al acusado la responsabilidad penal por la muerte del tercero inocente causada como resultado de sus actuaciones. Así, pues, sostuvimos que:

> ... el Art. 83 del Código Penal, según interpretado por nuestra jurisprudencia, nos une definitivamente a las jurisdicciones que aplican el rigor del asesinato estatutario a muertes sobrevenidas como consecuencia del acto delictivo, aunque éstas no hayan sido causadas por vía directa y particular del delincuente. Hoy reafirmamos esa interpretación no sólo con ánimo de mantener certeza y dirección en nuestra jurisprudencia, sino porque, en verdad, no nos corresponde alterar el juicio legislativo dirigido, como hemos visto, a la disuación de delitos que, como el robo, rebasan de ordinario su acrecentado contenido perjudicial y *degeneran en la irreparable pérdida de vidas inocentes.* (Énfasis suplido.) *Pueblo v. Calderón Laureano*, supra, pág. 580.

No obstante, en el caso ante nos la situación es claramente distinguible. No se trata ya de la muerte de un tercero inocente, sino de la muerte de un coautor del delito, provocada por sus propias actuaciones delictivas. Bajo estas cir-

cunstancias, ¿procede la convicción del apelante bajo la doctrina de asesinato estatutario? Resolvemos que no.(2)

■ En primer lugar, hemos de reconocer que la mayoría de las jurisdicciones en E.U., de donde proviene la doctrina de asesinato estatutario, han optado por limitar el alcance de la misma bajo el fundamento de que dicha doctrina crea una ficción legal, esto es, le imputa al autor del delito grave la malicia premeditada, el *mens rea* que requiere el asesinato en primer grado, aun cuando la misma no existe expresamente, sino que se infiere de la mera comisión del delito grave. Así, por ejemplo, en *State v. Doucette*, 470 A.2d 676, 681 (1983), el Tribunal Supremo de Vermont señaló que:

> The rationale for the felony murder rule, according to La-Fave and Scott, is that the defendant is a "bad person" because he or she is committing a felony, so society should not concern itself with the fact that the result accomplished (a death) may have been very different from the result the person actually intended. W. LaFave & A. Scott, *supra*, at 560. This rationale, however, violates one of the criminal law's most basic principles: a person is not criminally liable for causing a bad result if he or she did not have some culpable mental state with respect to that result . . . .
>
> The common law felony murder doctrine violates this basic principle by holding liable for murder a person whose felonious act results in a homicide, regardless of whether that homicide occurred intentionally, recklessly, negligently, or accidentally. *Aaron*, supra, 409 Mich. at 708–09, 299 N.W.2d at 317. The felony murder rule "'erodes the relation between criminal liability and moral culpability,'" *Id.* at 708, 299 N.W.2d at 317 (quoting *People v. Washington*, 62 Cal. 2d 777,

---

(2) En *Pueblo v. Calderón Laureano*, 113 D.P.R. 574, 576 (1982), apuntalamos que:

"El problema se suscita en circunstancias muy diversas. Un caso donde la aplicación del asesinato estatutario ha sido rechazada muchas veces, *es aquel en que se acusa a un coautor por la muerte de un cómplice a manos de la Policía o de la víctima.*" (Énfasis suplido.)

783, 402 P.2d 130, 134, 44 Cal. Rptr. 442, 446 (1965)), and therefore does not accord with the principles underlying our modern criminal justice system.[3] (Citas omitidas.)

Fue con el fin de limitar la severidad que la aplicación de la doctrina acarrea, que la mayoría de las jurisdicciones adoptaron la teoría de la agencia. Así, sólo aquellas muertes causadas directamente por el autor del delito o su cómplice pueden imputársele a éste bajo la doctrina de asesinato estatutario.

■ No obstante, en esta jurisdicción optamos por no limitar la doctrina de asesinato estatutario únicamente a muertes causadas directamente por el autor del delito o su cómplice, sino que optamos por adoptar la teoría de la causa próxima por ser ésta más inclusiva, que "'mejor cumple con las necesidades del Puerto Rico de hoy'". *Pueblo v. Calderón Laureano*, supra, pág. 579, citando de *Pueblo v. Batista Montañez*, 113 D.P.R. 307, 313 (1982). Reiteramos dicha doctrina.

■ Es de todos conocida la alta incidencia criminal que azota nuestra isla. Esto, sumado a los altos riesgos que usualmente involucra la comisión de delitos tales como los comprendidos en el asesinato estatutario, nos lleva a interpretar con mayor rigor las disposiciones del asesinato estatutario, de modo que pueda imponérsele responsabilidad por la muerte a quien realmente la tiene, independientemente de que la misma no haya sido causada directamente por el imputado o querida por éste.

■ Esto no implica que toda muerte ocurrida durante la comisión de un delito grave sea imputable al autor del delito. Para imputarle una muerte al autor del delito grave debe

---

[3] Véase, en el ámbito local, el comentario en L.F. González Correa, *Análisis crítico de la doctrina del "felony-murder"*, 27 Rev. Jur. U.P.R. 383 (1957).

existir una relación de causa y efecto entre el acto delictivo y la muerte ocasionada.

> Es norma generalmente reconocida que para que un daño o resultado delictivo pueda imputarse a una persona es necesario que el mismo haya ocurrido como consecuencia de su acción u omisión, o sea, que haya una relación de causa y efecto entre el acto y el daño. *Pueblo v. Lucret Quiñones*, supra, pág. 741.

En torno a la causalidad, en *Pueblo v. Lucret Quiñones*,(4) supra, pág. 741, expresamos que:

> La causalidad, como se ha dicho en Italia, es "una salvaguarda del ciudadano . . . contra toda extensión arbitraria de la norma penal". Corte Italiana de Casación, sec. 1, 23 de enero de 1966. Silving, por su parte, nos dice que "es un standard [medida] de limitación de responsabilidad, que opera proporcionando un principio de selección entre varias personas cuya intención y conducta se dirigen hacia un resultado dado cuando tal resultado se produce en los hechos, principio que permite elegir a una de esas personas como objeto de la sanción. La razón para seleccionar como tal objeto al imputado que 'causó' el resultado es que su conexión con este último es más estrecha que la de los otros, aunque la intención de éstos puede haber sido más intensa que la de aquél y su conducta quizás, externamente más directa". H. Silving, *Elementos Constitutivos del Delito*, Ed. U.P.R., 1977, págs. 97–98. Véanse además, P.K. Ryu, *Causation in Criminal Law*, 106 U. Pa. L. Rev. 773, 797–798 (1958); F. Díaz Palos, *La causalidad material en el delito*, Barcelona, Ed. Bosch, 1953; R. Maurach, *Tratado de Derecho Penal*, Barcelona, Ed. Ariel[,] 1962, págs. 220–247.

En el caso ante nos, aun cuando el apelante participó en la comisión de un delito grave, sus actuaciones no fueron la causa próxima de la muerte ocasionada.

---

(4) En *Pueblo v. Lucret Quiñones*, 111 D.P.R. 716, 729 (1981), al analizar el historial de la doctrina señalamos que:

"La Regla al presente no es favorecida por los tribunales y sólo la aplican cuando la ley lo requiere y en esas instancias lo hacen con renuencia. Siempre que las circunstancias lo permiten moderan su aplicación." (Cita omitida.)

■ Entendemos que para imponer responsabilidad bajo la teoría de la causa próxima es necesario que el acusado o los participantes en el delito, aun cuando se hayan abstenido de matar por mano propia, hayan puesto en marcha, al cometer uno de los delitos comprendidos en la ley, una sucesión de eventos que previsiblemente conduzcan a la muerte de un ser humano. *Pueblo v. Calderón Laureano*, supra, pág. 578. El aquí apelante en ningún momento puso en marcha dicha sucesión de eventos. Al verse confrontado por la Policía, el apelante se limitó a soltar la bolsa que contenía el dinero robado y a huir del lugar del robo. Fue el propio coautor Mateo Ortiz quien, en una sucesión de eventos independientes y luego de haber concluido la comisión del robo, provocó su propia muerte. Estos eventos tenían una conexión más estrecha con la muerte ocasionada que la mera participación y responsabilidad por el robo por parte del apelante.(5)

■ El imputarle al apelante Rivera Torres la muerte de su coautor, provocada únicamente por las actuaciones de este último, sería extender la aplicación de la doctrina a una situación más allá de la considerada en *Pueblo v. Calderón Laureano*, supra, ya que entendemos que la doctrina de asesinato estatutario, según expresada en el Art. 83 del Código Penal, *supra*, e interpretada en *Pueblo v. Calderón Laureano*, supra, sólo comprende aquellas situaciones en que el propio autor del delito o su cómplice ocasionan una muerte o, aun cuando los autores del delito no ocasionan la muerte directamente, sí ponen en marcha una sucesión de eventos que ocasionan *la muerte de la víctima del delito o de un tercero inocente.*

---

(5) Los hechos en este caso y el de *Pueblo v. Lucret Quiñones*, supra, son distinguibles. Véase, además, para un caso en que el coautor resulta responsable, a *Pueblo v. Jiménez Hernández*, 116 D.P.R. 632 (1985).

Se revocará la sentencia en el caso de asesinato y se absolverá al apelante.

## III

Al considerar el error de que no procedían las sentencias con circunstancias agravantes, debemos tener en cuenta las circunstancias que tuvo ante sí el juez sentenciador y el resultado a que hemos llegado en cuanto a la convicción por el delito de asesinato. Eliminada ésta, tenemos ante nos la forma y manera en que el apelante cometió el robo. Como señaló el fiscal, fue un delito de violencia. El apelante, aunque no estaba armado, participó activamente en la comisión del delito. Una vez consumado, logró escapar del sitio de los hechos.

En *Pueblo v. Pérez Zayas*, 116 D.P.R. 197, 201 (1985), seguimos la regla básica y uniforme de que "[n]ormalmente no intervenimos en el ejercicio de la discreción del juez de instancia en la imposición de la pena". Ello debido a que debemos respetar la amplia rectitud decisoria del foro de instancia.

Resolvemos que en este caso las circunstancias no ameritan que intervengamos con la determinación de instancia de imponer las penas con circunstancias agravantes. *Pueblo v. Castro Muñiz*, 118 D.P.R. 625 (1987). Tampoco hay fundamento para variar su criterio de que las sentencias deberán cumplirse en forma consecutiva.

## IV

Estamos de acuerdo con el Procurador General en que la pena impuesta por infracción al Art. 6 de la Ley de Armas de Puerto Rico, *supra*, debe modificarse. El Art. 38 de esta ley, según enmendado por la Ley Núm. 110 de 4 de junio de 1980 (25 L.P.R.A. sec. 448), establece que toda per-

sona convicta por violación al Art. 6 de la misma, *supra*, será castigada de la manera siguiente:

(c) Con pena de reclusión por un término fijo de cuatro (4) años cuando el arma se use en la comisión o en ocasión de cualesquiera de los delitos graves especificados en la sec. 427 de este título. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes podrá ser reducida hasta un mínimo de tres (3) años.[6]

Procede, pues, modificar la sentencia por infracción al Art. 6 de la Ley de Armas de Puerto Rico, *supra*, a cinco (5) años.

*Se dictará sentencia de conformidad con lo aquí resuelto.*

El Juez Asociado Señor Negrón García emitió opinión disidente, a la cual se unen el Juez Asociado Señor Rebollo López y la Juez Asociada Señora Naveira de Rodón.

—O—

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se unen el Juez Asociado Señor Rebollo López y la Juez Asociada Señora Naveira de Rodón.

No podemos refrendar la opinión del Tribunal. "No es cuestión de ser o no ser 'liberal', es cuestión de elaborar jurisprudencia de frente a la realidad." *Pueblo v. Tribunal Superior*, 91 D.P.R. 19, 45 (1964), opinión disidente. Es improcedente la tesis propuesta por el apelante Juan Rivera Torres. Su condición de coautor no le libera de responsabilidad penal bajo la doctrina de asesinato estatutario por la muerte de su compañero Eduardo Mateo Ortiz, causada inmediata-

---

[6] El delito de robo está incluido en 25 L.P.R.A. sec. 427.

mente después de un robo, por los disparos de un agente de la Policía mientras huía.

Primeramente, esa inimputabilidad atenta contra el principio elemental penal —acogido en la corriente doctrinaria moderna— que sostiene la responsabilidad de aquellos que han actuado a través de agentes inocentes, incapacitados mentales o que ostentan inmunidad fundada en edad o coacción. En esos casos, aquel que induce o incita a la realización del acto criminal es responsable. Art. 35 del Código Penal, 33 L.P.R.A. sec. 3172. W.R. LaFave, *Substantive Criminal Law*, St. Paul, Minnesota, West Pub. Co., 1986, Vol. 2, Sec. 6.1, págs. 5–6. Segundo, estatutariamente el Código Penal prevee como asesinato estatutario toda muerte cometida al perpetrarse un robo o huida. Art. 83 del Código Penal, 33 L.P.R.A. sec. 4002. Tercero, nos parece ilógico y de poco valor social disuasivo contra la conducta y actividad criminal grupal —más de una persona— que la participación activa de uno de ellos, como coautor, en una empresa delictiva como la aquí observada y desplegada por Rivera Torres, le *inmunice* contra las probables consecuencias del acto original. El derecho penal no ofrece ese escudo. Después de todo, a priori, en el orden valorativo comunitario no existe —ni debería existir— inmunidad al robar para un ladrón o que quede impune la muerte de un delincuente. En último análisis, la privación de una vida humana y no la calidad de esa vida es lo que debe medir la severidad de la pena. D. Crump y S.W. Crump, *In Defense of the Felony Murder Doctrine*, 8 Harv. J.L. & Pub. Pol'y 359, 387 (1985). Y cuarto, la decisión a la que hoy arriba el Tribunal es incompatible con la *teoría de causa próxima* y el factor de probabilidades en que se inspiró *Pueblo v. Calderón Laureano*, 113 D.P.R. 574 (1982).

## I

El trasfondo fáctico del caso refleja claramente la existencia de una empresa común preconcebida por el apelante

Juan Rivera Torres y Eduardo Mateo Ortiz para ilegalmente, con un arma de fuego, asaltar la Farmacia Yarimar, de Las Lomas, en Río Piedras. A tal efecto simularon estar interesados en comprar una libreta escolar. Mateo Ortiz gritó que se trataba de un asalto y apuntó con un revólver a la farmacéutica Elba M. López Sanfeliz y a un empleado de la caja. Rivera Torres instigaba verbalmente a su compañero a que le disparara al empleado "para que ella hable". Bajo amenazas, la farmacéutica López Sanfeliz entregó una cadena que tenía en el cuello, el dinero de la caja y unas pastillas de *Valium*. Fue encerrada junto con el empleado en el baño. Ambos asaltantes salieron de la farmacia.

Mientras ocurría el robo, el agente del C.I.C., División de Robos, Amos Arocho Torres, en compañía del policía José A. Mojica Rivera —durante una patrulla preventiva, en un vehículo no rotulado— se habían detenido frente a la farmacia para dirigirse al salón de belleza contiguo. Allí fueron advertidos por una empleada que no había podido comprar un helado en la farmacia, pues estaba cerrada y no habían podido ver a nadie dentro a través de los cristales. Opinó que eso era raro. Los agentes fueron a investigar. Cuando llegaron a la farmacia vieron salir a los jóvenes Mateo Ortiz y Rivera Torres. Este último llevaba una bolsa. Mateo Ortiz le dijo al policía Mojica Rivera que la farmacia estaba cerrada. Los agentes sospecharon, se identificaron y les indicaron que estaban detenidos. Mateo Ortiz extrajo un arma de la cintura y corrió hacia la derecha y Rivera Torres hacia la izquierda. El agente Arocho Torres persiguió a Rivera Torres. Hizo dos (2) disparos al aire para que se detuviera. Rivera Torres soltó la bolsa y pudo escapar. Dicho agente recogió la bolsa y la entregó a la farmacéutica López Sanfeliz.

Coetáneamente, el policía Mojica Rivera persiguió a Mateo Ortiz, quien hizo caso omiso a unos disparos al aire y se internó en un solar cercano. Mateo Ortiz se viró y apuntó con su arma al policía. Mojica Rivera, bajo la creencia fundada

de que le iba a disparar, hizo fuego y lo hirió en la frente. Al caer Mateo Ortiz mortalmente, todavía tenía el arma en la mano izquierda. Todo el incidente —asalto y huida— ocurrió en pocos minutos. La autopsia de Mateo Ortiz reveló que la entrada de la bala fue en la región frontal derecha y la salida en la región parietal izquierda.

## II

Por estos hechos no contradichos, Rivera Torres fue acusado de violar los Arts. 83 y 173 del Código Penal, asesinato estatutario y robo, 33 L.P.R.A. secs. 4002 y 4279, y los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418. Luego de desfilada la prueba de cargo en el Tribunal Superior, Sala de San Juan, éste solicitó la absolución perentoria bajo el fundamento de que ni el pliego acusatorio ni la prueba configuraban un asesinato estatutario, pues la víctima no era un tercero inocente o el "perjudicado en uno de los delitos que contempla la doctrina".[1] Por el contrario, según indicado, el muerto era un coautor a quien el policía Mojica Rivera le dio muerte mientras cumplía con su deber. Art. 24 del Código Penal, 33 L.P.R.A. sec. 3097. D. Nevares-Muñiz, *Derecho Penal de Puerto Rico, revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 217.

Sometido el caso sin prueba adicional, un jurado rindió veredicto de culpabilidad en todos los cargos. Previa vista sobre circunstancias agravantes y atenuantes, el tribunal dictó sentencia con agravantes y, sobre la objeción de la defensa, impuso las penas consecutivas siguientes: noventa y nueve (99) años por el asesinato; veinte (20) años por el robo, y diez (10) años en cada infracción a la Ley de Armas de Puerto Rico.

---

[1] Antes de iniciarse el juicio había presentado sin éxito idéntica moción al amparo de la Regla 64(p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

## III

En su apelación, como error, Rivera Torres argumenta que la condición de coautor de la víctima Mateo Ortiz hace inaplicable la doctrina de asesinato estatutario. En su abono enfatiza que *Pueblo v. Calderón Laureano*, supra, está apuntalado en que la víctima era un tercero inocente. Por razones de justicia nos exhorta a que variemos la postura asumida en dicho caso. Allí, entre la "teoría de la agencia" y la de "causa próxima" adoptamos la segunda, pues la misma:

> . . . reconoce en el asesinato estatutario un intento de punir con el rigor máximo de la ley penal a aquellos participantes que aun absteniéndose de matar por mano propia, ponen en marcha, al cometer uno de los delitos comprendidos en la ley, una sucesión de eventos que, previsiblemente, conducen a la muerte de un ser humano. (Citas omitidas.) *Pueblo v. Calderón Laureano*, supra, pág. 578.

Debimos reiterar dicha teoría. Ciertamente la referencia en *Pueblo v. Calderón Laureano*, supra, en el sentido de que la víctima era un tercero inocente, *no es el factor clave y determinante para una convicción válida*. Nos explicamos.

La *teoría de agencia* considera asesinato estatutario si la muerte es causada directamente por el acusado, su cómplice o agente. La *teoría de causa próxima* admite su punibilidad como *asesinato estatutario* si, al cometerse el delito grave, el acusado puso en movimiento una sucesión de eventos que previsiblemente podían desembocar en la muerte de un ser humano.

Bajo esta dicotomía válida, reconocemos el valor de cierta jurisprudencia que sostiene que no es de aplicación la norma sobre asesinato estatutario cuando la víctima es un coautor. Varias razones de peso se aducen, a saber, que se trata de una muerte justificable, esto es, que no se ha cometido acto ilegal y, además, que no existe responsabilidad penal alguna pues la muerte es consecuencia de un acto legal.

*Campbell v. State*, 444 A.2d 1034 (Md. 1982); *Wooden v. Com.*, 284 S.E.2d 811 (Va. 1981); *Weick v. State*, 420 A.2d 159 (Del. 1980); *Jackson v. State*, 589 P.2d 1052 (N.M. 1979); *State v. Canola*, 374 A.2d 20 (N.J. 1977); *People v. Antick*, 539 P.2d 43 (Cal. 1975); *People v. Gilbert*, 408 P.2d 365 (1965); *People v. Austin*, 120 N.W.2d 766 (Mich. 1963), y *Commonwealth v. Redline*, 137 A.2d 472 (Pa. 1958). Debe destacarse que casi toda esta normativa jurisprudencial está básicamente apuntalada en la *teoría de la agencia* y no bajo la de *causa próxima* que rige en Puerto Rico.

Sin embargo, otra casuística rechaza esa distinción y aplica la doctrina de asesinato estatutario aun cuando la víctima sea el coautor. *Johnson v. State*, 486 So. 2d 657 (Fla. 1986); *State v. Baker*, 607 S.W.2d 153 (Mo. 1980); *Commonwealth ex rel. Smith v. Myers*, 261 A.2d 550 (Pa. 1970); *Taylor v. Superior Court of Alameda County*, 477 P.2d 131 (Cal. 1970); *Commonwealth v. Balliro*, 209 N.E.2d 308 (Mass. 1965); *Robbins v. People*, 350 P.2d 818 (Co. 1960). No puede ser de otro modo.

Aunque la cuestión ha sido objeto de intenso debate y críticas, fieles a *Pueblo v. Calderón Laureano*, supra, nos inclinamos hacia esta solución. El mejor razonamiento expositivo que derrota los argumentos de la opinión mayoritaria aparece en un comentario a *Commonwealth v. Redline*, supra. Por su carácter persuasivo, estimamos apropiado reproducirlo:

Parece, sin embargo, que [*Commonwealth v. Almeida*, 362 Pa. 596, *cert.* denegado, 339 U.S. 924 (1950)] no puede distinguirse válidamente de [*Commonwealth v. Redline*]. *La probabilidad de que un autor pueda ser muerto parece ser tan alta como la probabilidad de que la víctima sea un inocente espectador. No parece estar justificada* cualquier distinción basada en el hecho de que la muerte de un autor causada por un policía esté sancionada por la ley y por ende sea justificable, mientras que la muerte de un espectador inocente sea meramente excusable. Al presente, no existe sanción penal que se ciña a

alguna de ellas en otras áreas del derecho penal, y hacer una distinción aquí parecería una anomalía. *Verdaderamente, hacer que el resultado dependa del tipo de víctima es, en muchas ocasiones, hacerlo depender del grado de puntería de los que oponen resistencia.* Cualquier intento por distinguir los casos, en la teoría de que el coautor asume el riesgo de ser muerto, sería también inapropiado ya que esta doctrina de daños y perjuicios *no tiene lugar en derecho penal, en que el mal a ser remediado es público —aunque una muerte ocurra con el consentimiento de la víctima no deja de ser un asesinato.* Es muy dudoso que el deseo público de venganza pueda por sí solo justificar una convicción por asesinato estatutario, por la muerte de un espectador inocente, cuando no se le atribuye responsabilidad criminal por la muerte de un coautor. (Énfasis y traducción nuestros.) Casos recientes, *Homicide,* 71 Harv. L. Rev. 1565, 1566–1567 (1958).

La solidez de este enfoque, de vanguardia en el derecho penal, es evidente. Véase W. Harrison Hitchler, *The Killer and His Victim in Felony–Murder Cases,* 53 Dick. L. Rev. 3, 10 y 11 (1948).

La opinión mayoritaria está en pugna con la teoría de "causa próxima" del asesinato estatutario rubricada en *Pueblo v. Calderón Laureano,* supra. Por lógica la misma aplica cuando un policía, en cumplimiento de su deber, da muerte a un coautor mientras huye de la escena del crimen. Con la decisión de hoy nos apartamos de la misma y, además, debilitamos el interés legislativo que encontró eco estatutario en el Art. 83 del Código Penal, *supra.* Damos las espaldas a la realidad reconocida en *Pueblo v. Lucret Quiñones,* 111 D.P.R. 716, 739–740 (1981), respecto a que el "sentido común nos dice que al efectuarse un robo, en que de ordinario los asaltantes utilizan armas de fuego o letales para producir la intimidación, . . . [n]o es necesario mucho esfuerzo mental para comprender que al efectuarse . . . el asaltante razonablemente ha previsto o puede prever que la consecuencia natural o probable de su acción puede desembocar en la muerte

de alguna persona. Art. 15 del Código Penal, 33 L.P.R.A. sec. 3062".

En el contexto específico de los hechos de este caso, ¿puede seriamente sostenerse que el apelante Rivera Torres, al concertadamente planificar y realizar el asalto con un arma de fuego peligrosa, no puso en marcha unos eventos que previsiblemente podían conducir a la muerte, no sólo de inocentes, sino de su compañero Mateo Ortiz? ¿Puede válidamente argumentarse una distinción entre la probabilidad de que muera un inocente o un coautor? Sinceramente, no creemos que exista tal diferencia.

Pero hay más. Bajo la teoría de causalidad que rige en nuestra jurisdicción, los hechos no permiten separar su conducta en compartimientos aislados entre la etapa del asalto y el intento de huida al ser perseguidos por la Policía. Por su naturaleza, un robo no se completa hasta que sus protagonistas huyen a un lugar seguro. En la comisión de ese delito el comportamiento delictivo y la fluidez de la situación impiden esa dicotomía. Aquí, la escapatoria inmediatamente después —dado su localización próxima— formó parte esencial y estuvo inextricablemente unida al evento original criminoso del asalto iniciado y perpetrado por el apelante Rivera Torres.

El enfoque no es inventiva nuestra, sino corolario "y pariente del análisis de causa próxima". Crump y Crump, *supra*, pág. 388. Se origina en el reconocimiento judicial de que una muerte acaecida durante una escapatoria relacionada con el delito grave cometido, puede estimarse comprendida y punible como asesinato estatutario si en términos de unidades de tiempo, manera y sitio, está conectada con el robo inicial. La mayoría de las jurisdicciones siguen esta visión en virtud de la teoría de *res gestae*, a saber, si la muerte fue cometida durante, con respecto a, o como parte de la transacción principal. Anotación, *What Constitutes Termination of Felony For Purpose of Felony Murder–Rule*, 58 A.L.R.3d

851, 876 *et seq*. Representativo de esta visión, California sostiene que un robo no está consumado si sus autores "no han ganado acceso, aunque sea momentáneamente, a un sitio temporal seguro y la posesión del botín no es más que una lucha por poseerlo. En tal caso, el uso continuo del arma que fue necesaria para ayudar al delincuente a obtener la posesión de la propiedad robada, es necesaria para proteger esa posesión y hacer posible su huida. . . . La huida de los asaltantes con el botín, por medio del uso de armas, necesariamente es tan importante para la ejecución del plan como el ganar posesión de la propiedad. Sin revólveres con qué aterrorizar, o si la ocasión lo amerita, para asesinar a cualquier persona que intente aprehenderlos durante o inmediatamente después de ganar la posesión de esa propiedad, su plan sería cosa de niños". (Traducción nuestra.) *People v. Boss*, 290 P. 881, 883 (Cal. 1930). Véase, además, *People v. Salas*, 500 P.2d 7 (Cal. 1972).

## IV

Aunque la opinión mayoritaria no articula extensamente su razón de decidir, es obvio que la premisa mayor en que descansa es "la severidad que la aplicación de la doctrina acarrea". Opinión del Tribunal, pág. 137. Al respecto menciona que la doctrina de asesinato estatutario "crea una ficción legal, esto es, le imputa al autor del delito grave la malicia premeditada . . .". Íd., pág. 136. Aparentemente, pues, la decisión de hoy realmente se anima en un espíritu de misericordia judicial, movido por el señalamiento del apelante Rivera Torres de las durezas de las penas que le fueron impuestas por el tribunal sentenciador.

La cuestión merece cierta elaboración. De lo contrario, nos arriesgamos a entremezclar y a confundir los principios jurídicos atinentes con nuestros sentimientos.

A tal efecto, el apelante Rivera Torres aduce que el Ministerio Público no demostró circunstancias agravantes que

justificaran, consecutivamente, noventa y nueve (99) años de prisión por el asesinato estatutario, veinte (20) años por el robo y diez (10) años por cada caso de la Ley de Armas de Puerto Rico, para un total de ciento treinta y nueve (139) años de prisión. En el foro de instancia, pidió que se dictara sentencia en consideración a los siguientes hechos en calidad de atenuantes: "El acusado no utilizó ningún arma de fuego; no agredió a ninguna persona; no apuntó a nadie con ningún tipo de arma; no intercambió disparos con la policía ni con ninguna otra persona; no fue la persona que mató de un disparo al Sr. Eduardo Mateo, tan solo se demostró por el Ministerio Público su participación en la comisión de un robo y que como consecuencia de dicho acto murió el coautor Sr. Eduardo Mateo Ortiz, sin que hubiese estado presente el acusado Sr. Rivera Torres, además de que el acusado Rivera Torres es un joven de 18 años quien no tiene antecedentes penales."[2]

Ante nos ha reiterado ese pedido predicado en el Art. II, Sec. 12 de nuestra Constitución, L.P.R.A., Tomo 1; Regla 171 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; el Art. 60 del Código Penal, 33 L.P.R.A. sec. 3284,[3] y en *Pueblo v. Pérez Zayas*, 116 D.P.R. 197 (1985).

---

[2] En cierto sentido, en algunos casos la confidencialidad que rodea todo trámite ante un Tribunal Tutelar de Menores —según la anterior Ley de Menores de Puerto Rico, 34 L.P.R.A. ant. sec. 2007(f), y la actual, 34 L.P.R.A. sec. 2237(d)— opera como un impedimento para que los tribunales, al juzgar y sentenciar a un convicto después que ha alcanzado la edad de dieciocho (18) años, posean cabalmente todos los elementos de juicio objetivos para graduar las penas. El desconocimiento de ese historial previo de conducta delictiva, si alguna, puede conllevar la ficción de que no tiene antecedentes penales.

Aclaramos, que al evaluar el señalamiento del aquí apelante Rivera Torres, hemos partido de la premisa de que al arribar a los dieciocho (18) años de edad carecía de récord penal previo. Corresponde al Poder Legislativo examinar la sabiduría y razón de ser de esa confidencialidad establecida en la Ley de Menores de Puerto Rico en su aplicación al Art. 60 del Código Penal, 33 L.P.R.A. sec. 3284.

[3] En lo pertinente, dispone:

". . . las penas se fijarán de acuerdo a la mayor o menor gravedad del hecho cometido y tomando en consideración, entre otras, las siguientes circunstancias:

Por su parte, el Procurador General reproduce la postura asumida en instancia por el Ministerio Público que invocó como agravantes: "El delito fue de violencia y se causó en el presente caso la muerte de un ser humano; se demostró hechos que revelan una gran crueldad, ningún respeto [hacia el ser] humano y un rechazo a los [valores] mínimos de decencia, a la vida y a la propiedad de sus semejantes; el acusado como co-autor de un robo utilizó un arma de fuego; llevó a cabo una posición de líder ante otro participante cuando en la [c]omisión del delito de [r]obo, le decía a su coautor y citamos— 'pégale un tiro para que hable y diga d[ó]nde están las cosas'."

En *Pueblo v. Pérez Zayas*, supra, nos negamos a intervenir con el modelo legislativo de sentencias determinadas de la Ley Núm. 100 de 4 de junio de 1980 (34 L.P.R.A. sec. 1044), aunque aclaramos que en nuestra función adjudicativa judicial "velaremos por que, conforme al Art. II, Sec. 12 de nuestra Constitución, no se impongan castigos crueles e inusitados. Esta cláusula requiere penas proporcionales a la severidad de la conducta delictiva, penas no arbitrarias, la imposición, en fin, de la pena menos restrictiva de libertad para lograr el fin por el cual se impone". (Citas omitidas.) *Pueblo v. Pérez Zayas*, supra, pág. 201.

En la consecución de ese propósito, este Tribunal de ordinario —fundado en la separación de poderes constitucionales y una respetuosa deferencia hacia el poder legislativo— no

---

"(a) La naturaleza de la acción u omisión delictuosa.
"(b) Los medios empleados.
"(c) La importancia de los deberes transgredidos.
"(d) La extensión del daño [o] del peligro causado.
"(e) La edad, educación, historial social y reputación del autor.
"(f) La conducta relacionada con el delito antes, durante y después de la comisión del mismo.
"(g) La calidad de los móviles del hecho.
"(h) La conducta de la víctima relacionada con la transacción delictuosa." 33 L.P.R.A. sec. 3284.

alterará los términos de una sentencia enmarcada dentro de los límites de ley. Bajo la premisa de que el castigo determinado por la Asamblea Legislativa debe estar en proporción con el problema social que tiende a evitar, sólo examinaremos si la misma, per se, constituye o no un castigo excesivo. *Pueblo v. Pérez Zayas*, supra; *Pueblo v. Ortiz Pepín*, 105 D.P.R. 547 (1977); *Pueblo v. Pedrosa Muriel*, 98 D.P.R. 34 (1969); *Pueblo v. Pérez Méndez*, 83 D.P.R. 228 (1961).

Conforme *Pueblo v. Pérez Zayas*, supra, pág. 201, "[n]ormalmente no intervenimos en el ejercicio de la discreción del juez de instancia en la imposición de la pena", y habremos de respetar la amplia latitud decisoria del foro de instancia al imponer las penas. *Pueblo v. Santiago Padilla*, 100 D.P.R. 782 (1972). El contacto directo con la prueba y los múltiples detalles que generan los dramas vivos judiciales penales sitúan a dichos magistrados en posición más ventajosa para aquilatar y remediar, de manera individual, el agravio social. Los estrados apelativos tienen sus límites.

Bajo este prisma, en lugar de descartar la aplicación de la *teoría de relación causal* del asesinato estatutario, en los hechos específicos de este caso, debimos únicamente moderar las penas movidos por la severidad de las mismas, específicamente su carácter consecutivo. Veamos.

La situación de autos presenta una muerte ocurrida y encausable por asesinato estatutario atribuible al apelante Rivera Torres. La razón de ser en que se apuntala la imposición de responsabilidad penal bajo la doctrina de causa próxima —aunque no es incompatible con castigar con el rigor máximo de la ley a un coautor convicto por la muerte de otro coautor muerto a manos de la Policía— sí obliga al tribunal a escudriñar y evaluar su procedencia. Las circunstancias específicas dictarán sus límites. Bajo este enfoque, sin modificar las penas por el asesinato, robo y el Art. 8 de la Ley de Armas de Puerto Rico, *supra*, lo procedente era eliminar su carácter consecutivo. De ese modo, el espíritu de compasión

humano-judicial que todos compartimos logra equilibrar el interés público y social encarnado legislativamente en la doctrina de asesinato estatutario, frente al principio de individualidad y proporción en la aplicación del castigo.(4)

Descartarla en el caso de autos es lamentable. A modo de recordatorio, quizás sea una buena ocasión para transcribir de *Pueblo v. Lucret Quiñones*, supra, pág. 737, en párrafo aparte, el extracto que satisfactoriamente compendia sus méritos intrínsecos:

> Es inevitable concluir que el Poder Legislativo prescindió de toda recomendación tendiente a excluir la referida doctrina. Es razonable determinar que el fundamento que movió a ese foro a adoptar tal postura fue el enunciado por Holmes: "... [s]i la experiencia demuestra, o el legislador entiende que demuestra, que de alguna manera las muertes que, de acuerdo a la evidencia, son accidentales ocurren con desproporcionada frecuencia en conexión con otros delitos, *o con resistencia ofrecida a oficiales del orden público*, o si en base a la política pública se entiende que es necesario llevar a cabo esfuerzos especiales para prevenir esas muertes, el legislador puede siempre considerar que actos que, en ciertas circunstancias, *son criminales o constituyen resistencia a oficiales del orden público, tienen una tendencia suficientemente peligrosa como para ubicarlos bajo una prohibición especial. Es por esto que la ley puede achacar al autor del peligro no sólo las consecuencias que éste puede prever, sino también aquellas que, aunque no pueden predecirse a base de la experiencia ordinaria, puedan ser percibidas por el legislador.*" Resumiendo, su mantenimiento responde a una política pública gubernamental. (Énfasis suplido y escolio omitido.)

---

(4) Finalmente, la pena por infringir el Art. 6 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 416, debe ser reducida de diez (10) a cinco (5) años por interacción de sus Arts. 38 y 17 (25 L.P.R.A. secs. 448(c) y 427). El Art. 38 preceptúa que la pena no será "menor de dos (2) años ni mayor de cinco (5) años cuando el arma se use en la comisión o en ocasión de la comisión de cualesquiera de los delitos graves especificados en la sec. 427 de este título". 25 L.P.R.A. sec. 448(c). El robo es uno de los delitos enumerados en el Art. 17. En cuanto a la pena por el Art. 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 418, la misma está dentro de los límites del Art. 42 de dicha ley, 25 L.P.R.A. sec. 452.

154

En virtud de lo expuesto, disentimos. Lo apropiado era modificar las sentencias en los extremos apuntados.